JOHN R. READ (DC Bar #419373)
MEAGAN K. BELLSHAW (CA Bar #257875)
CORY BRADER LEUCHTEN (NY Bar # 5118732)
SARAH H. LICHT (DC Bar #1021541)
United States Department of Justice, Antitrust Division
450 Fifth Street, NW, Suite 4000
Washington, DC  20530
Telephone: (202) 307-0468
Facsimile: (202) 514-7308
E-mail:  john.read@usdoj.gov

[Additional counsel listed on signature page]

Attorneys for Plaintiff United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>_Plaintiff_<br>v.<br><br>VISA INC. and PLAID INC.,<br><br>_Defendants_. | Case No.:<br><br>**COMPLAINT** |

Visa seeks to buy Plaid – as its CEO said – as an "insurance policy" to neutralize a "threat to our important US debit business."  Visa is a monopolist in online debit transactions, extracting billions of dollars in fees annually from merchants and consumers.  Plaid, a financial technology firm with access to important financial data from over 11,000 U.S. banks, is a threat to this monopoly: it has been developing an innovative new solution that would be a substitute for Visa's online debit services.  By acquiring Plaid, Visa would eliminate a nascent competitive threat that would likely result in substantial savings and more innovative online debit services for

-1-

merchants and consumers.  For the reasons discussed below, the proposed acquisition violates Section 2 of the Sherman Act, 15 U.S.C. § 2, and Section 7 of the Clayton Act, 15 U.S.C. § 18, and must be stopped.

## INTRODUCTION

1.     Visa is "everywhere you want to be."[1]  Its debit cards are accepted by the vast majority of U.S. merchants, and it controls approximately 70% of the online debit transactions market.  In 2019, there were roughly 500 million Visa debit cards in circulation in the United States.  That same year, Visa processed approximately 43 billion debit transactions, including more than 10 billion online transactions.  In 2019, Visa earned over $4 billion from its debit business, including approximately $2 billion from online debit.

2.     American consumers increasingly make purchases online, attracted by the convenience of being able to shop any time, from anywhere, with fast delivery.  In recent years, online transactions have experienced "explosive" growth, a trend that has only been accelerated by the COVID-19 pandemic, with online sales growing more than 30% between the first and second quarters of 2020.

3.     American consumers use debit cards to purchase hundreds of billions of dollars of goods and services on the internet each year.  Many consumers buying goods and services online either prefer using debit or cannot access other means of payment, such as credit.  Because of its ubiquity among consumers, merchants have no choice but to accept Visa debit despite perennial complaints about the high cost of Visa's debit service.

4.     Visa's monopoly power in online debit is protected by significant barriers to entry and expansion.  Visa connects millions of merchants to hundreds of millions of consumers in the United States.  New challengers to Visa's monopoly would thus face a chicken-and-egg quandary, needing connections with millions of consumers to attract thousands of merchants and needing thousands of merchants to attract millions of consumers.  Visa's Chief Financial Officer has acknowledged that building an extensive network like Visa's is "very, very hard to do" and

---

[1] https://usa.visa.com/.

"takes many years of investment," but "[i]f you can do that, then you can have a business [like Visa's] that has a relatively high margin." He explained that entry barriers are so significant that even well-funded companies with strong brand names struggle to enter online debit.

5.     Mastercard, Visa's only longstanding rival in online debit services, has a much smaller market share of around 25%. For years, Mastercard has neither gained significant share from Visa nor restrained Visa's monopoly. Mastercard's participation in the online debit market has not translated into lower prices for consumers, and this appears unlikely to change. For example, Visa has long-term contracts with many of the nation's largest banks that restrict these banks' ability to issue Mastercard debit cards. Visa also has hamstrung smaller rivals by either erecting technical barriers, or entering into restrictive agreements that prevent rivals from growing their share in online debit, or both.

6.     These entry barriers, coupled with Visa's long-term, restrictive contracts with banks, are nearly insurmountable, meaning Visa rarely faces any significant threats to its online debit monopoly. Plaid is such a threat.

7.     Plaid is uniquely positioned to surmount these entry barriers and undermine Visa's monopoly in online debit services. Plaid powers some of today's most innovative financial technology ("fintech") apps, such as Venmo, Acorns, and Betterment. Plaid's technology allows fintechs to plug into consumers' various financial accounts, with consumer permission, to aggregate spending data, look up balances, and verify other personal financial information. Plaid has already built connections to 11,000 U.S. financial institutions and more than 200 million consumer bank accounts in the United States and growing. These established connections position Plaid to overcome the entry barriers that others face in attempting to provide online debit services.

8.     While Plaid's existing technology does not compete directly with Visa today, Plaid is planning to leverage that technology, combined with its existing relationships with banks and consumers, to facilitate transactions between consumers and merchants in competition with Visa. Like Visa's online debit services, Plaid's new debit service would enable consumers to pay for goods and services online with money debited from their bank accounts. With this new

-3-

online debit service, Plaid intended to "steal[] share" and become a "formidable competitor to Visa and Mastercard."  Competition from Plaid likely would drive down prices for online debit transactions, chipping away at Visa's monopoly and resulting in substantial savings to merchants and consumers.

9.     Visa feared that Plaid's innovative potential – on its own or in partnership with another company – would threaten Visa's debit business.  In evaluating whether to consider Plaid as a potential acquisition target in March 2019, Visa's Vice President of Corporate Development and Head of Strategic Opportunities expressed concerns to his colleagues about the threat Plaid posed to Visa's established debit business, observing: "I don't want to be IBM to their Microsoft."  This executive analogized Plaid to an island "volcano" whose current capabilities are just "the tip showing above the water" and warned that "[w]hat lies beneath, though, is a massive opportunity – one that threatens Visa."  He underscored his point by illustrating Plaid's disruptive potential:



10.     Several months later, Visa had the opportunity to acquire Plaid.  While conducting extensive due diligence, Visa's senior executives became alarmed to learn about Plaid's plans to add a "meaningful money movement business by the end of 2021" that would compete with Visa's online debit services.  This prompted Visa's CEO to conclude that Plaid was "clearly, on their own or owned by a competitor going to create some threat to our important

-4-

US debit business" and to tell his CFO that purchasing Plaid would be an "insurance policy to protect our debit biz in the US."

11.     In making the case to buy Plaid to Visa's Board of Directors, Visa's senior leadership estimated a "potential downside risk of $300-500M in our US debit business" by 2024 should Plaid fall into the hands of a rival.  Visa understood that could create an "[e]xistential risk to our U.S. debit business" and that "Visa may be forced to accept lower margins or not have a competitive offering."

12.     On January 13, 2020, Visa agreed to acquire Plaid in part to eliminate this existential risk and protect its monopoly in online debit.  Visa offered approximately $5.3 billion for Plaid, "an unprecedented revenue multiple of over 50X" and the second-largest acquisition in Visa's history.  Recognizing that the deal "does not hunt on financial grounds," Visa's CEO justified the extraordinary purchase price for Plaid as a "strategic, not financial" move because "[o]ur US debit business i[s] critical and we must always do what it takes to protect this business."

13.     Monopolists cannot have "free reign to squash nascent, albeit unproven, competitors at will."  *United States v. Microsoft Corp.*, 253 F.3d 34, 79 (D.C. Cir. 2001).  Acquiring Plaid would eliminate the nascent but significant competitive threat Plaid poses, further entrenching Visa's monopoly in online debit.  As a result, both merchants and consumers would be deprived of competition that would drastically lower costs for online debit transactions, leaving them with few alternatives to Visa's monopoly prices.  Thus, the acquisition would unlawfully maintain Visa's monopoly in violation of Section 2 of the Sherman Act.

14.     Visa's proposed acquisition also would violate Section 7 of the Clayton Act, which was "designed to arrest the creation of monopolies 'in their incipiency,'" *United States v. Gen. Dynamics Corp.*, 415 U.S. 486, 505 n.13 (1974), and similarly prohibits a monopolist from bolstering its monopoly through an acquisition that eliminates a nascent but significant competitive threat.  The Supreme Court has explained that an acquisition can violate Section 7 when "the relative size of the acquiring corporation ha[s] increased to such a point that its advantage over its competitors threaten[s] to be 'decisive.'"  *Brown Shoe Co. v. United States*,

370 U.S. 294, 321 n.36 (1962).  Visa already has a decisive market position through its online debit monopoly, and would unlawfully extend that advantage by acquiring Plaid.  For the reasons set forth in this Complaint, the proposed acquisition must be enjoined.

## JURISDICTION

15.     The United States brings this action under Section 15 of the Clayton Act, as amended, 15 U.S.C § 25, and Section 4 of the Sherman Act, 15 U.S.C. § 4, to prevent and restrain Visa from violating Section 2 of the Sherman Act, 15 U.S.C. § 2, and Defendants from violating Section 7 of the Clayton Act, 15 U.S.C. § 18.  This Court has subject matter jurisdiction over this action under Section 15 of the Clayton Act, 15 U.S.C § 25, Section 4 of the Sherman Act, 15 U.S.C. § 4, and 28 U.S.C. §§ 1331, 1337.

16.     Defendants Visa and Plaid are engaged in interstate commerce and in activities substantially affecting interstate commerce.  Visa and Plaid sell online debit and data aggregation services throughout the United States.  They are engaged in a regular, continuous, and substantial flow of interstate commerce, and their sales have had a substantial effect on interstate commerce.

17.     This Court has personal jurisdiction over each Defendant.  Both Visa and Plaid are corporations that transact business within this District through, among other things, their sales of online debit transactions and data aggregation services.

## VENUE

18.     Venue is proper in this district under Section 12 of the Clayton Act, 15 U.S.C. § 22 and 28 U.S.C. § 1391.  Both Defendants are headquartered and transact business in this judicial District.

## INTRADISTRICT ASSIGNMENT

19.     Assignment to the San Francisco Division is proper.  This action arises in San Francisco County because a substantial part of the events that gave rise to the claims occurred in San Francisco.  Plaid's headquarters and principal place of business is located in San Francisco.  Visa's headquarters are in San Mateo County; Visa has offices in San Francisco and is building new headquarters in San Francisco.

-6-

**DEFENDANTS AND THE PROPOSED ACQUISITION**

20.     Visa Inc. is a Delaware company headquartered in Foster City, California.  Visa is a global payments company that operates the largest debit network in the United States.  Visa provides a two-sided transactions platform that authorizes, clears, and settles debit transactions between businesses, consumers, and banks.  Visa reported revenues of approximately $23 billion in fiscal year 2019, including $10.3 billion in the United States.

21.     Plaid Inc. is a Delaware company headquartered in San Francisco, California.  Plaid operates the leading financial data aggregation platform in the United States.  Its technology allows consumers to connect their bank account information to fintech apps, which enables fintechs to aggregate consumer spending data, look up account balances, and verify other personal financial information with consumer permission.  Plaid's revenues have been growing rapidly and were almost $100 million in 2019.

22.     On January 13, 2020, Defendants announced that Visa would acquire all of Plaid's voting securities for consideration valued at approximately $5.3 billion.

**BACKGROUND**

23.     A debit transaction involves a multi-step process that results in the transfer of funds from a consumer's bank account into a merchant's bank account using the consumer's bank account credentials.  When a consumer makes an online purchase using their debit card credentials (i.e. a debit card number, expiration date, and CVV/CVC number on the back of a debit card), a debit transaction withdraws funds from the consumer's bank account.  The online merchant uses the consumer's credentials to send a request to the merchant's bank (the "acquiring" bank or "acquirer"), which in turn uses the debit network to send a request to the consumer's bank (the "issuing bank" or "issuer") to confirm whether the issuer will authorize the transaction.  The issuer will typically authorize the transaction if there is a sufficient account balance to fund the transaction.  If the transaction is authorized, the consumer's bank places a hold on the consumer's funds.



24.     Debit networks – Visa, Mastercard, and a handful of smaller networks – operate the systems that transmit these messages.  Once the consumer's issuing bank authorizes the transaction, the debit network also guarantees the funds to the merchant.  Debit networks typically do not issue cards directly to consumers or establish card-accepting services with merchants.  The debit networks typically contract with the acquiring and issuing banks, which in turn contract with merchants and consumers, respectively.  The debit network also clears and oversees the interbank settlement process by aggregating all transactions each day for each bank in its system, netting out applicable fees, and providing daily settlement reports to the banks. With few exceptions, the debit networks are not themselves banks and do not move money; rather, the networks' settlement reports are used by the banks to transfer funds among themselves, typically using a wire service available only to banks.

**A.     Visa is a Monopolist in Online Debit Services**

25.     Visa is a monopolist among providers of online debit services, with a durable market share of approximately 70%.

26.     Visa's next closest rival is Mastercard, which is around one-third the size of Visa in online debit.  Mastercard has not constrained Visa's monopoly power by forcing it to lower prices to merchants and consumers.  Merchants that accept debit payments have no choice but to accept Visa.  In contrast to credit cards, most consumers carry only one debit card.  A consumer with a Visa debit card cannot use a Mastercard debit card to withdraw funds from the same checking account.

27.     Visa has secured long-term contracts with many of the largest financial institutions in the United States, fortifying the barriers that help maintain its monopoly.  These contracts limit these financial institutions' ability to issue debit cards from Mastercard, Visa's only meaningful competitor for card issuance.  Visa understands that Mastercard has little ability

-8-

to displace Visa's relationships with those financial institutions and consequently little ability to grow its share of consumers' wallets.

28.    Merchants are charged two types of fees by Visa and its partner banks, both set by Visa: the "network" fees Visa collects to process the transaction, and the "interchange" fees that Visa compels merchants to pay the banks that issue Visa-branded debit cards.  Taken together, the debit network and interchange fees that Visa and its partner banks collect cost U.S. merchants and consumers more than $6 billion per year.

29.    While consumers do not pay Visa directly to use its payment network – and relatively few earn significant rewards on Visa debit transactions – consumers indirectly pay for Visa's transaction fees in the price of the goods and services they buy from merchants.  In this way, Visa's excessive debit fees operate as a tax on merchants that is passed on to consumers and burdens the entire economy.

30.    Recognizing the burden imposed by high debit fees and the barriers to competition in the market for debit transactions, Congress sought to "correct the market defects that were contributing to high and escalating fees" with the Durbin Amendment of the 2010 Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010).  The Durbin Amendment aimed to reduce high fees charged by debit networks with a regulatory cap and increase the number of meaningful debit competitors.

31.    But the Durbin Amendment caps only interchange fees that accrue to Visa's large issuing banks, and does not regulate the network fees that accrue to Visa.  As a result, Visa has responded by imposing new fees on merchants that undermine the effectiveness of the Durbin Amendment's fee caps.  Even after enactment of the Durbin Amendment, Visa estimates that it earns an 88% operating margin from its network fees on debit payments, illustrating its durable monopoly power.

32.    The Durbin Amendment also requires Visa and Mastercard debit cards to include a feature that allows merchants to process transactions using one of the so-called "PIN" debit networks.  These smaller PIN networks, such as Accel, Star, NYCE, and Pulse, have some meaningful presence for in-person debit transactions, but have yet to overcome the barriers to

entry for online transactions.  This is in part because Visa has erected technological barriers (such as Visa's tokenization service, which withholds essential data from PIN networks) and entered into restrictive agreements that disincentivize the use of PIN networks.  As a result, merchants do not use PIN networks in any significant volume to process online transactions, and instead pay higher fees to use Visa and Mastercard networks.

**B.      Pay-by-Bank is a New Form of Online Debit Service that Threatens Visa's Monopoly**

33.      For the first time in many years, a new type of payments service is poised to take share away from Visa's online debit business.  Pay-by-bank is a form of online debit that uses a consumer's online bank account credentials (i.e. a consumer's online banking username and password) – rather than debit card credentials – to identify and verify the user, bank, account number and balance, and facilitate payments to merchants directly from the consumer's bank account.

34.      Pay-by-bank debit services are already widely available in other countries.  A pay-by-bank platform facilitates consumer-to-business payments by providing equivalent end-to-end functionality as the Visa debit network: it authorizes payment from a consumer's bank account, facilitates communications with the consumer's bank to clear the transaction, and provides settlement services by initiating a payment to the merchant's financial institution.  Pay-by-bank debit services can complete this final transfer of funds using Automated Clearing House ("ACH") or another low-cost alternative to Visa's debit network.

35.      ACH enables settlement of transactions through money transfers over a network managed by two utility-like operators, one run by the Federal Reserve and the other operated by The Clearing House, which is owned by a consortium of banks.  A pay-by-bank debit transaction using ACH settlement is usually much less expensive than a debit transaction processed by a card network like Visa.

36.      Banks typically charge merchants flat rates ranging from two ($0.02) to twenty-five cents ($0.25) for ACH transactions, whereas Visa debit transactions typically cost twenty-two cents ($0.22) plus a percentage of the overall value of the transaction, which can be

significant.  For example, merchants and consumers typically pay roughly thirty-nine cents ($0.39) to process a $60 debit transaction (the average online debit transaction size) through Visa's network, compared to as little as two cents ($0.02) through ACH, a 95% savings.  By harnessing these savings using its best-in-class technology and existing relationships with banks and consumers, Plaid stands to save merchants and consumers hundreds of millions of dollars per year in debit fees.

      **C.**    **Plaid is Uniquely Situated to Challenge Visa**

      37.    Plaid's technology currently provides an easy interface for fintech apps to collect consumers' financial data, with consumer permission.  When a consumer signs up with a Plaid-supported fintech app and provides her bank log-in credentials, Plaid uses those credentials to access the consumer's financial institution and obtain the consumer's financial data, which it transmits back to the fintech app.  The data Plaid retrieves ranges from basic identifying information, such as account and routing numbers, to detailed transaction history and close to real-time account balance information.  This data allows fintech apps to offer personal financial management tools, manage bill payments or other expenses, support loan underwriting, and transfer funds, among other uses.  Plaid's services can also be used to reduce fraud by verifying the consumer's identity and account balance, examining the consumer's bank account history, assuring that a transaction is bona fide, and confirming that there are sufficient funds to cover a transaction at the time of payment.

      38.    Plaid is uniquely positioned to offer a pay-by-bank debit service that would compete with Visa's online debit services.  Plaid already supports over 2,600 fintech apps, including 80% of the largest such apps in the United States, and has a network of more than 11,000 U.S. financial institutions.  Plaid also connects to over 200 million consumer bank accounts through its existing services.  Plaid's extensive existing connections with banks and consumers gives Plaid a substantial competitive advantage that cannot be easily replicated by other firms.  It also helps Plaid surmount the chicken-and-egg barrier faced by potential entrants to online debit:  Plaid already connects with millions of consumers' debit accounts, making them

an attractive partner for merchants looking for an alternative payments provider that has already built scale among consumers.

39. According to Visa, Plaid "has created a leading position of strength in the business of connecting financial institutions in the United States" and is "the preferred connector company by developers." Plaid is regarded by the industry as the best of breed among companies that provide similar services; no Plaid competitor provides the same high-quality connections to such a large number of fintech customers or financial institutions. Plaid's fintech customers are likely to stick with Plaid because they face substantial switching costs once they integrate with Plaid.

40. Plaid plans to build on the success of its current services by creating an "end-to-end payments network that enables instantly-guaranteed money movement" in a system "similar to Visa and Mastercard, but focused on bank-linked payments." Plaid's online pay-by-bank debit service would compete against Visa's online debit services. Plaid's service would give Plaid and other fintechs the capability to make a seamless pay-by-bank debit transaction, by providing a fraud risk score service, bank transfer service, and a consumer-facing interface allowing a consumer to easily switch from a debit card to pay-by-bank debit services during the online checkout process. Plaid has seen "strong interest from the field" for its fraud risk score and bank transfer services and is piloting them with multiple fintech customers.

41. Plaid's development of its own end-to-end pay-by-bank debit service directly threatens Visa's online debit business. Once deployed, Plaid's service would provide a reliable, less-expensive method of online debit payments by enabling consumers and merchants to transact for goods and services.

**D.   Visa Intends to Buy Plaid to Extinguish this Threat and Protect its U.S. Online Debit Monopoly**

42. Visa made an initial investment in Plaid in early 2019. Through that investment, Visa executives learned more about Plaid and came to understand that Plaid posed a significant threat to Visa's debit business. Several months later, in September 2019, one of Plaid's co-founders telephoned Visa's President to inform him that Plaid was putting itself up for sale and

that Visa should expect to pay around $5 billion if it wanted to acquire Plaid.  Visa saw that it

had to act or risk Plaid falling into the hands of a rival that could use Plaid to compete against

Visa in online debit.

43.   Visa set to work verifying what makes Plaid a unique competitive threat.  It

identified Plaid's particular strengths through due diligence, spending thousands of hours

reviewing all aspects of Plaid's business.  Visa also confirmed that no other firm was in a

position to replicate or displace Plaid.  As Visa's Chief Product Officer explained, Plaid "has a

head start in a network business and have been a highly compelling and attractive developer

value proposition with 40% of American banks accounts enrolled – in the US they have a

network moat."  This view was shared by Visa's CEO, who described Plaid as "by far the best

player in the space" with "a huge lead in the connector business."

44.   As Visa learned more about Plaid's efforts to launch its own pay-by-bank debit

service that would directly compete with Visa, its executives grew increasingly alarmed.  During

an early November 2019 meeting involving executives from both firms, Plaid's co-founder

explained how Plaid's nascent technology would allow merchants to shift transactions easily

from traditional forms of online debit to Plaid's pay-by-bank debit service.  This prompted a

senior Visa executive to report internally that Plaid's co-founder had "described the service with

the joy of someone who forgot we had 70% share."  Ultimately, Visa recognized that the best

course of action for its business was to eliminate Plaid as a competitive threat by purchasing

Plaid itself.  In internal documents, a Visa executive observed that "[t]he acquisition is in part

defensive, not just for Visa but also on behalf of our largest issuing [bank] clients, whom we

believe have a lot to lose if [pay-by-bank transactions] accelerate as the result of Plaid landing in

the wrong hands.  It is in our collective interest to manage the evolution of these payment forms

in a way that protects the commercial results we mutually realize through card-based

payments."

### E.   Visa Has a History of Impeding Entry and Expansion into Online Debit Services

45.   Visa's proposed acquisition of Plaid fits within an established pattern of Visa trying to thwart others from challenging its monopoly power.  Specifically, Visa has a long history of protecting its monopoly in online debit by entering into contracts that forestall entry and coopt would-be rivals with lucrative partnerships.  In addition to locking up many of the largest U.S. financial institutions with long-term, restrictive contracts that limit these banks' ability to issue debit cards from Visa competitors, Visa has entered into a number of "partnerships" that benefit Visa at the expense of merchants and consumers.  This conduct has prevented cheaper, more efficient online debit options from gaining traction.

46.   For example, in 2016, PayPal sought to divert business from traditional online debit providers like Visa by using lower-cost payment methods that moved money via ACH.  In response, Visa publicly threatened to target PayPal "in ways people have never seen before." After issuing its threats, Visa induced PayPal to stop promoting alternative payment methods and to instead promote Visa debit in exchange for significant financial benefits.  As Visa's Senior Vice President and Head of Product for North America explained, PayPal has been less of a threat to Visa's online debit business in recent years because "Visa and PayPal have figured out a way to be partners, as opposed to, sort of, direct competitors" and have found "ways to work together, as opposed to not work together."

47.   In another example, Visa induced a major technology company to agree not to "build, support or introduce payment technologies that disintermediate Visa" in exchange for substantial fee reductions.  In current negotiations to renew this ongoing agreement, Visa is demanding that the technology company continue to abide by Visa's exclusionary practices, including not encouraging customers to use less expensive payment methods and prohibiting "marketing to non Visa options during payment checkout."

48.   Similarly, Visa recently pushed a large payment processor to limit its use of alternative payment methods because of the "strategic risk" those alternative payment methods present to Visa.

49.     In addition, Visa has inhibited the adoption of alternative lower-cost networks for online debit by disincentivizing banks from enabling the use of alternative debit networks.  Visa has also tied up merchants' abilities to select less expensive alternative networks for processing debit payments through restrictive rules and agreements, thereby helping Visa grow and maintain its monopoly in online debit.

50.     Each of these actions has protected Visa's online debit monopoly from the threat of disruptive entrants, at the expense of merchants and consumers.

**RELEVANT MARKET**

A.     **Product Market**

51.     *Online debit transactions ("online debit").*  Providers of online debit transactions serve as intermediaries between consumers and merchants, operating two-sided transactions platforms that facilitate online transactions between merchants and consumers from their respective bank accounts.  Online debit payments are made from funds that are already present in a consumer's bank account instead of relying on a line of credit.  Visa's traditional card-based debit network facilitates the transfer of funds between merchants and consumers by relying on a bank-issued debit credential to identify the consumer.  Plaid provides an alternative mechanism to facilitate payments between consumers and merchants that uses a consumer's online bank login credentials to identify the consumer and facilitate payments via ACH.

52.     The online debit market includes traditional online debit services and emerging pay-by-bank debit services.  Both the traditional online debit services and new pay-by-bank debit services enable consumers to pay for goods and services directly from the funds in their bank accounts and merchants to accept payments drawn from consumer bank accounts.

53.     Online debit in the United States constitutes a relevant product market under the antitrust laws.  Few merchants or consumers would find alternative payment services to be a suitable substitute for online debit.  Thus, there are no reasonable substitutes for online debit, and a firm that was the only seller of online debit services would be able to maintain prices above the level that would prevail in a competitive market.

-15-

54.     In-person debit payments, known as "card present" payments, are not reasonably interchangeable because, unlike an online debit payment, the consumer must be physically present in a store or using a physical debit card at a payment terminal to make a card-present debit payment.

55.     Credit card payments also are not reasonably interchangeable with online debit because debit payments draw from funds already in a consumer's bank account, rather than drawing from a line of credit.  The distinction between credit and debit is widely accepted in the payments industry.  Visa and other card networks have different pricing systems for debit and credit transactions, and the Durbin Amendment's limitations on transaction fees apply only to debit.  Many consumers do not qualify for credit cards or have a strong preference for paying out of their existing funds rather than taking on debt to make purchases using a line of credit, which can be financially risky.

56.     Payments made through basic ACH transfers offered by The Clearing House or the Federal Reserve are often used for disbursements, paychecks, interbank settlements, and recurring fixed payments like mortgage and tuition payments.  A basic ACH transfer is not reasonably interchangeable for most online debit transactions.  ACH transfers are inconvenient for consumers because they require a burdensome onboarding process in which the consumer must enter her bank account and routing information for each merchant, and then take steps to verify her account, which requires additional input and can take several hours or even days.  ACH transfers are inconvenient for merchants because it takes two to three days to determine whether a payment is successful, and such transfers are more subject to fraud.

57.     Cash payments are not reasonably interchangeable for online debit transactions because cash cannot be used for online payments.  Checks are not reasonably interchangeable for online debit transactions because, like cash, checks are physical tokens that cannot readily be used for online payments.

58.     Online debit transactions platforms are two-sided transactions platforms that exhibit a high degree of interdependency between consumers on the one side and merchants on the other.  Consumers get more value from a network that connects to more merchants and

-16-

merchants get more value from a network that connects to more consumers. The online debit market is a two-sided market for transactions between merchants and consumers. The price for an online debit transaction takes both sides into account.

**B.    Geographic Market**

59.    The United States is the relevant geographic market. Both Visa and Plaid treat the United States as a distinct geographic market, as demonstrated in part by Visa's separate rules governing merchant acceptance in the United States and its separate pricing of online debit payments services to merchants in the United States. Federal laws and regulations that govern online debit transactions operate on a national level. A firm that was the only seller of online debit in the United States would be able to maintain prices above the level that would prevail in a competitive market.

**ANTICOMPETITIVE EFFECTS**

60.    Visa has monopoly power in the online debit market, with a durable market share of approximately 70% that is protected by high barriers to entry.

**A.    Visa's Proposed Acquisition of Plaid Would Result in Higher Prices for Online Debit Transactions**

61.    Plaid's entry into online debit services as a pay-by-bank debit service would erode Visa's monopoly power by giving merchants and consumers a cheaper, more innovative alternative to Visa's online debit services. This would likely result in lower prices for online debit transactions and a higher volume of online debit transactions.

62.    Because pay-by-bank fees to merchants are considerably lower than Visa's online debit fees, many merchants would likely seek to move online transactions from Visa's debit service to Plaid's pay-by bank debit service at the point of sale. Most consumers have only one debit card. Thus, when a consumer is making an online purchase directly from her bank account, she cannot switch between Visa debit and Mastercard debit using the same bank account – but she could switch to Plaid's pay-by-bank debit service during the checkout process. Consumer ability to switch payment options at the point of sale is one of the reasons why Plaid's pay-by-bank debit service poses such a significant threat to Visa even at its nascent stage. To minimize

losses to Plaid and defend its online debit volume, Visa would likely reduce the prices it currently charges for online debit transactions.

63.     Indeed, Plaid recognizes that pricing for its pay-by-bank debit service "needs to be highly competitive with debit card pricing."  Plaid has considered introducing certain components of its pay-by-bank debit service at a "50% reduction" compared to traditional debit and anticipates that merchants could save millions of dollars a year in fees by making it easier for consumers to switch away from card-based online debit.  Plaid was upfront with Visa about its plans to undercut Visa's online debit prices.  After meeting with Plaid executives in December 2019, Visa's Vice President of Corporate Development and Head of Strategic Opportunities expressed concern that if Visa did not buy Plaid "they will clearly come after the 'high prices' of interchange as they said several times yesterday and offer alternate payment methods."

64.     Thus, as Visa itself has recognized, competition from Plaid would mean that prices for online debit transactions would fall.  This would benefit merchants and ultimately consumers, who would pay less for goods and services as merchants pass on their savings.  Consumers may also benefit from rewards or other incentives that merchants offer to induce switching to Plaid's pay-by-bank debit service.

65.     But Visa's proposed acquisition of Plaid would forestall this competition, allowing Visa to maintain its monopoly position and supracompetitive prices for online debit.

**B.      Visa's Proposed Acquisition of Plaid Would Result in Less Innovation**

66.     Visa's proposed acquisition of Plaid also would eliminate a disruptive and innovative competitor.  Visa viewed Plaid as a "threat . . . across multiple vectors of our business, including . . . as a potential payment network."  If the acquisition were enjoined, Plaid – on its own or in combination with a company other than Visa – would continue to act as a disruptive competitor, developing and launching new, innovative solutions in competition with Visa.  In the hands of Visa, this would change dramatically.

67.     In contrast to an independent Plaid, Visa would have the incentive to raise the price of, degrade, delay, or shelve altogether Plaid's nascent pay-by-bank debit service because

such a service would cannibalize Visa's profitable online debit business.  Indeed, Visa's CEO has already acknowledged that Visa has no intention of introducing Plaid's pay-by-bank debit service for consumer payments to merchants in the United States.  Since inking the deal with Visa, Plaid has slowed its plans to pilot its pay-by-bank debit service with prospective merchant customers.

**C.      Visa's Proposed Acquisition of Plaid Would Raise Entry Barriers**

68.      As a monopolist with an approximately 70% market share in online debit, Visa has a strong incentive to continue to suppress entry by prospective rivals.  It stands to lose more than any other participant in the online debit market from entry or expansion because any new pay-by-bank service is likely to compete away Visa's lucrative online debit transaction volume.  As a result, Visa has a greater incentive than any other player in online debit to prevent or delay the emergence of potential competitors.

69.      Acquiring Plaid would give Visa the ability to raise the already high entry barriers faced by competitors seeking to enter or expand into online debit payments, further entrenching Visa's monopoly power in online debit.

70.      Through its ownership of Plaid, Visa would have a "[f]ront row seat to what is happening in the [f]intech world (e.g. which apps are growing, at what velocity and where)."  With this insight into which fintechs are more likely to develop competitive alternative payments methods, Visa could take steps to partner with, buy out, or otherwise disadvantage these up-and-coming competitors.  Plaid's current services "sit at the 'decision chokepoint' for many future payment flows."  Owning Plaid would position Visa to insulate itself from competition, for example, by buying out or partnering with other fintechs before they can gain traction.

71.      Further, Visa would be able to leverage its close relationships with issuing banks to disadvantage other would-be entrants.  Both Visa and issuing banks profit from online debit payments.  If the proposed transaction is not enjoined, Visa is likely to incentivize issuing banks to refuse to connect with competitors of Plaid, preventing other would-be entrants from threatening the profits that both Visa and issuing banks earn from high online debit transaction fees.  Indeed, Visa has already communicated to U.S. banks that "[i]t is in our collective interest

1    to manage the evolution of these payment forms in a way that protects the commercial results we

2    mutually realize through card-based payments."

3        72.    Acquiring Plaid would also give Visa access to Plaid's enormous trove of

4    consumer data, including real-time sensitive information about merchants and Visa's rivals.

5    Consolidation of this data in Visa's hands could further raise barriers to entry and expansion.

6    Visa could use that data to make it more difficult for others to enter or compete against Visa in

7    online debit or to deter pro-competitive initiatives from rivals.

8        73.    Overall, merchants and consumers stand to benefit from the lower cost of online

9    debit transactions enabled by Plaid's innovative pay-by-bank debit service.  Visa acquiring Plaid

10   would diminish or eliminate those benefits, eradicate Plaid as a competitive threat, and raise

11   entry barriers for future competitive threats, in violation of Section 2 of the Sherman Act, 15

12   U.S.C. § 2 and Section 7 of the Clayton Act, 15 U.S.C. § 18.

13                              **LACK OF COUNTERVAILING FACTORS**

14       74.    Although Defendants have claimed that the proposed acquisition would generate

15   synergies by combining the operations of Visa and Plaid, any cognizable efficiencies will not

16   outweigh the merger's harm to competition in the relevant market.  Visa concedes that there is

17   "very little" about the deal that leads to cost synergies and "[i]n fact, it has cost dissynergies

18   associated with it."  Further, Visa's CEO has acknowledged that Visa has no plans to launch

19   Plaid's pay-by-bank debit services for consumer payments to merchants.

20       75.    Visa's proposed acquisition of Plaid would not result in verifiable, transaction-

21   specific efficiencies in the relevant market sufficient to outweigh the transaction's likely

22   anticompetitive effects.  The proposed acquisition would harm competition overall in the

23   relevant market.  Moreover, the anticompetitive effects of Visa's proposed acquisition of Plaid

24   outweigh any procompetitive benefits in the relevant market, and any procompetitive benefits

25   can be achieved through less restrictive means.

26                                    **VIOLATIONS ALLEGED**

27       76.    If allowed to proceed, Visa's proposed acquisition of Plaid would eliminate the

28   nascent competitive threat that an independently owned Plaid poses to Visa's monopoly power

and unlawfully maintain Visa's monopoly power in the online debit market.  The proposed acquisition constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

77.     In addition, if allowed to proceed, the effect of Visa's proposed acquisition of Plaid "may be substantially to lessen competition, or to tend to create a monopoly" in the online debit market in the United States in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18.

78.     Among other things, the transaction would:

(a)     maintain Visa's monopoly power, giving Visa the power to raise prices and increase barriers to entry;

(b)     eliminate nascent competition between Visa and Plaid;

(c)     likely cause prices of online debit transactions to be higher than they would be otherwise; and

(d)     likely reduce quality, service, choice, and innovation.

## REQUEST FOR RELIEF

79.     The United States requests:

(a)     that Visa's proposed acquisition of Plaid be adjudged to violate Section 2 of the Sherman Act, 15 U.S.C. § 2;

(b)     that Visa's proposed acquisition of Plaid be adjudged to violate Section 7 of the Clayton Act, 15 U.S.C. § 18;

(c)     that the Defendants be permanently enjoined and restrained from carrying out the proposed acquisition of Plaid by Visa or any other transaction that would combine the two companies;

(d)     that the United States be awarded costs of this action; and

(e)     that the United States be awarded such other relief as the Court may deem just and proper.

Dated: November 5, 2020                      Respectfully submitted,


_____/s/ Makan Delrahim_____              _____/s/ John R. Read_____
MAKAN DELRAHIM                               JOHN R. READ (DC Bar #419373)
Assistant Attorney General                   Meagan K. Bellshaw (CA Bar #257875)
                                             Brittney Dimond (WA Bar #55889)
                                             Ihan Kim (NY Bar, No Numbers Assigned)
_____/s/ Michael F. Murray_____           Cory Brader Leuchten (NY Bar # 5118732)
MICHAEL F. MURRAY                            Sarah H. Licht (DC Bar #1021541)
Deputy Assistant Attorney General            Bennett J. Matelson (DC Bar #454551)
                                             Lillian Okamuro (DC Bar #241035)
                                             Ethan Stevenson (NY Bar, No Numbers
_____/s/ Kathleen S. O'Neill_____         Assigned)
KATHLEEN S. O'NEILL                          Lara E.V. Trager (NY Bar #4566048)
Senior Director of Investigations and Litigation   Jeffrey G. Vernon (DC Bar #1009690)


_____/s/ Craig W. Conrath_____
CRAIG W. CONRATH                             Attorneys for the United States
Director of Civil Litigation


                                             Media, Entertainment, and Professional
                                             Services Section
_____/s/ Owen M. Kendler_____             U.S. Department of Justice
OWEN M. KENDLER                              Antitrust Division
Chief                                        450 Fifth Street N.W., Suite 4000
                                             Washington, D.C. 20530
_____/s/ Lisa A. Scanlon_____             Telephone: (202) 307-0468
LISA A. SCANLON (CA Bar #208186)
Assistant Chief                              Email: john.read@usdoj.gov
Media, Entertainment, and Professional Services
Section

DAVID L. ANDERSON
United States Attorney

_____/s/ Sara Winslow_____
SARA WINSLOW
Assistant United States Attorney
Chief, Civil Division

1

## ATTORNEY ATTESTATION

I hereby attest, pursuant to Local Rule 5-1(i)(3), that the concurrence in the filing of this document has been obtained from the signatory indicated by the "conformed" signature (/s/) of John R. Read within this e-filed document.

/s/ John R. Read
John R. Read

COMPLAINT